IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

MICHAEL AWOSIKA

    Defendant.

Criminal No.: ELH-17-311

**MEMORANDUM OPINION**

Defendant Michael Awosika was sentenced on July 3, 2018, to a term of fifteen years' imprisonment (180 months) for the offense of carjacking on April 8, 2017, in violation of 18 U.S.C. § 2119. ECF 45 (Judgment). He has moved for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A). ECF 63 (the "Motion"). In the Motion, Awosika asks the Court to appoint counsel for him. *Id.*

The government opposes the Motion (ECF 67, the "Opposition"), supported by an exhibit. ECF 67-1 (Awosika's medical records). Awosika has not replied.

No hearing is necessary to resolve the Motion. Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I.  Background

On June 13, 2017, a grand jury sitting in the District of Maryland indicted Awosika on multiple charges, including carjacking on April 8, 2017, in violation of 18 U.S.C. § 2119 (Count One); possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Two); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g) (Count Three). ECF 1.

On May 8, 2018, Awosika entered a plea of guilty to the carjacking offense (ECF 41), pursuant to a plea agreement. ECF 38. The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of fifteen years of incarceration. *Id.* ¶¶ 9, 10. That sentence corresponded to the statutory maximum for the offense. *Id.* ¶ 3. However, it was well below the statutory maximum of life imprisonment, to which defendant was exposed in connection with the firearm offense charged in Count Two under 18 U.S.C. § 924(c). Moreover, if Awosika were convicted of that offense, he would have faced a mandatory minimum sentence of ten years, consecutive to any other sentence.  *See* ECF 43 (defense sentencing letter, explaining that the agreed sentence was "the product of a reasoned negotiation" that avoided the § 924(c) count) at 1.

The Statement of Facts included with the Plea Agreement (ECF 38 at 8) detailed the events of April 8, 2017.  On that date, "A.C." was taking her 5-month-old grandson out of her vehicle when the defendant entered the front seat of the vehicle, pointed a gun at A.C. and the baby, and fled in the vehicle.  *Id.*  A police officer saw the vehicle traveling at a high rate of speed but was unable to stop the driver.  *Id.*  A Baltimore City Fire Department Captain observed defendant driving down the road "in a dangerous manner." *Id.* The defendant then crashed the car into other vehicles at an intersection.  *Id.*  As the Captain approached, defendant fired two shots at the Captain's vehicle. *Id.*

Defendant stipulated to the facts set forth by the government in the Plea Agreement (ECF 38 at 9) and also at the Rule 11 proceeding. *See* ECF 51 (guilty plea Transcript), ECF 55-2 (same). Awosika, who was under oath (ECF 55-2 at 2), expressly agreed with the accuracy of the government's factual summary. *Id.* at 34. And, he expressly stated that he committed the crime as summarized by the government, and was pleading guilty freely and voluntarily, because he was guilty, as charged. *Id.*

The Plea Agreement anticipated a final offense level of 26.  ECF 38, ¶ 7(c).  The Amended Presentence Report ("PSR, ECF 47) was consistent.  *Id.* ¶ 24.

In particular, the PSR reflected a base offense level of 20.  ECF 47, ¶ 14.  Seven points were added for discharge of a firearm, *id.* ¶ 15, and two points were added because the offense involved carjacking.  *Id.* ¶ 16.  After deductions for acceptance of responsibility, *id.* ¶¶ 22, 23, the PSR reflected a final offense level of 26.  *Id.* ¶ 24.

The defendant has a long criminal history.  *Id.* ¶¶ 34-49.  This resulted in a criminal history category of VI.  *Id.* ¶ 52.  His prior record included convictions for possession with intent to distribute cocaine base, *id.* ¶ 36, as well as cocaine.  *Id.* ¶ 38.  Notably, in March 2004, Awosika was convicted in federal court of possession of a firearm by a felon.  *Id.* ¶ 40; *see* WDQ-04-0007 (D. Md.).  Judge William D. Quarles, Jr., to whom the case was assigned, initially sentenced him to 63 months of imprisonment.  WDQ-04-007, ECF 17.  But, on remand following an appeal (*id.*, ECF 25), the sentence was reduced to 55 months.  *Id.*, ECF 27.  The defendant subsequently violated his supervised release.  ECF 47, ¶ 40.  And, in March 2008, he was convicted of possession of a homemade knife by an inmate.  *Id.* ¶ 41.  Further, he was twice convicted of assault, *id.* ¶¶ 39, 48, and once for felony threats.  *Id.* ¶ 47.

Sentencing in this case was held on July 3, 2018.  ECF 45.  At that time, Awosika, who was born in 1978, was thirty-nine years old.  *See* ECF 47 at 2. Defendant reported a history of weekly heroin and marijuana use. *Id.* ¶ 76.

As noted, Awosika had a final offense level of 26 and a criminal history category of VI. *Id.* ¶ 83.  Therefore, the Guidelines called for a period of imprisonment ranging from 150 to 180 months. *Id.*  Pursuant to the C Plea, I imposed a sentence of 180 months' imprisonment, with credit for time served since April 8, 2017, to be followed by three years' supervised released.

On November 5, 2018, Awosika filed a post-conviction motion under 28 U.S.C. § 2255. ECF 50. By Memorandum Opinion (ECF 61) and Order (ECF 62) of May 9, 2019, I denied that motion.[1]

Thereafter, on July 16, 2021, defendant filed the Motion.  ECF 63. Awosika seeks compassionate release on the basis of his history of cancer, back pain, and schizophrenia. *Id.*

The government does not contest that Awosika has exhausted his administrative remedies. But, it contends that Awosika is receiving adequate medical treatment. ECF 67 at 6. And, the government argues that Awosika should not be granted compassionate release because he "poses a danger to the community." *Id.*

Awosika is currently serving his sentence at USP McCreary. He has a projected release date of September 5, 2030.   *See Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed Apr. 21, 2023). To date, defendant has served approximately 44% of his sentence.

Additional facts are discussed, *infra*.

## II.  Appointment of Counsel

The Office of the Federal Public Defender has declined to represent the defendant in regard to the Motion.  ECF 69.  Awosika asks the Court to appoint counsel for him to assist in litigating the Motion.  ECF 63.

There is no constitutional right to appointed counsel in post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further.").  Rather, the determination to appoint counsel

---

[1] Awosika had also filed a motion to vacate in Case 04-0007.  *Id.*, ECF 55.  The motion was denied by Judge Catherine Blake, without prejudice.  *Id.*, ECF 58.

rests solely within the discretion of the district court. *See United States v. Legree*, 205 F.3d 724, 730 (4th Cir. 2000) (explaining that a district court has the discretion to appoint defendant counsel under 18 U.S.C. § 3582(c) in exceptional circumstances).

A review of defendant's case does not reveal any unusual or exceptional circumstances that would warrant the appointment of counsel. And, Owasika has been able to articulate the basis for his claims.

Therefore, I shall deny defendant's request for counsel, without prejudice.

### III. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson,* 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Congress "broadened" the authority of the courts in 2018, with passage of the First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)). *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality in regard to a federal sentence.

*United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

As a result of the enactment of the FSA in December 2018, a federal inmate is now permitted to file a motion for compassionate release directly with the court after exhaustion of administrative remedies. *See United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. (Emphasis added). *Id.*

Once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition

a court directly for compassionate release. *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. This constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Bethea*, 54 F.4th at 831. In other words, the analysis consists of "two steps." *Bond*, 56 F.4th at 383. And, for a court to award compassionate release, it must conclude that the movant satisfies both criteria. *Bethea*, 54 F. 4th at 831; *see Hargrove*, 30 F.4th at 194-95.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021). If that criteria is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and

compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[2]  In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy,* 981 F.3d at 276.

However, as the Fourth Circuit has recognized, there is no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A).  *See, e.g.*, *Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276.  Of significance here, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the FSA.  It is *only* "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v.*

---

[2] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*Brooker,* 976 F.3d 228, 235-36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  And, because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam).  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release., U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  But, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons.  *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); *see United States v. Gutierrez*, ___ Fed. App'x ___, 2023 WL 245001, at *4 (4th Cir. Jan. 18, 2023) (stating that, in considering a compassionate release motion, the district court erred by failing to address the defendant's evidence of rehabilitation).  Nevertheless, "rehabilitation alone cannot serve as a basis for

compassionate release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t). Moreover, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022. In that case, the Supreme Court said, in the context of § 404(b) of the First Step Act, that "a district court cannot . . . recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act [of 2010] . . . ." *Id.* at 2402 n.6. The Court explained that the "Guidelines range 'anchor[s]' the sentencing proceeding . . . . The district court may then consider postsentencing conduct or nonretroactive changes . . . with the properly calculated Guidelines range as the benchmark." *Id.* (first alteration in original; internal citation omitted); *see also United States v. Troy*, 64 F.4th 177, 183-84 (4th Cir. 2023).

To be sure, the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion*, 142 S. Ct. at 2396; *Troy,* 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *Brice*, 2022 WL 3715086, at *2. However, such changes do not warrant a recalculation of the Guidelines. *Troy,* 64 F.4th at 184.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As explained, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, that does not end the inquiry.  The second step requires the court to consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. Mangarella*, 57 F.4th 197, 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the

sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

Of relevance, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167. And, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions, and had "'a reasoned basis'" for the exercise of his or her discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

Moreover, where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *Mangarella*, 57 F.4th at 203; *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n. 3. That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189. Moreover, "the district court is less likely to have abused its discretion if it considered

12

arguments in opposition to its ultimate decision." *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

As the Fourth Circuit has observed "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *United States v. Jackson*, 952 F.3d 492, 500 (4th Cir. 2020)).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384-85.

In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case."  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190).  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *Cohen*, 2022 WL 2314302, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In doing so, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling."  *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

### IV. COVID-19[3]

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[4]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19

---

[3] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* TRUMP WHITE HOUSE (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.    That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).  People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus could cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of March 10, 2023, COVID-19 has infected more than 103.8 million Americans.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Apr. 20, 2023).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the

pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In February 2023, the CDC updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (February 10, 2023), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease,

cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://www.cdc.gov/aging/covid19/index.html. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196. Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19." *Bethea*, 54 F.4th at 832.

**B.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://bit.ly/3dPA8Ba (last accessed Apr. 20, 2023). However, social distancing is

particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg.*

*Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir.

Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on

[sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to

isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868,

at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28,

2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating

to maintaining sanitation, the risk of infection and the spread of infection within prisons and

detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating

areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An*

*Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16,

2020).  And, they are not free to follow their own rules.

    To illustrate, prisoners are not readily able to secure safety products on their own to protect

themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance

themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal*

*Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-

reusable masks for months and a lack of transparency around policies for personal protective

equipment and testing). They do not get to decide where, when, or how to eat or sleep.

Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to

stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr.

3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-

19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through*

*the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary

settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[5]

---

[5] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

**C.**

19

Unfortunately, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.   Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

On March 29, 2022, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.   Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the initial vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021),

https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  Much has changed since that time.

As of April 19, 2023, the BOP had 145,196 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 349,798 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS,  https://www.bop.gov/coronavirus/ (last updated Apr. 19, 2023).

Also as of April 2023, approximately 69% of the total U.S. population has completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up.  *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL,  https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-pop5 (last updated Apr. 12, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccination-demographics-trends (last updated Apr. 12, 2023);   Moreover, approximately 54.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 5 and older.  *See id.*; *COVID-19*

*Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Apr. 13, 2023).

**D.**

The number of COVID-19 cases continues to fluctuate. For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html. But, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

Unfortunately, we then experienced another surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ." *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases. As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants." Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/. But, the variant then seemed to

subside.  *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Apr. 15, 2023).

At this point, COVID-19 has, in a sense, become a fact of life.  *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. TIMES, Sept. 5, 2021,  https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").  In other words, we are in "a more endemic phase of this crisis . . . ."  *See* District of Maryland Standing Order 2022-05, Misc. No. 00-308 (filed Dec. 14, 2022).  Indeed, in an interview in September 2022 on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id.*

Moreover, on February 10, 2023, President Biden provided notice of his intent to terminate the COVID-19 national emergency, effective May 11, 2023.  *Termination of COVID-19 National Emergency*, ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS (Apr. 3, 2023).  And, Congress has passed a joint resolution (H.J. Res. 7) seeking to end the national emergency, perhaps earlier than May 11, 2023.  *Id.*

In any event, it appears that "virus metrics have stabilized."  Standing Order 2022-05. Indeed, as of March 10, 2023, Johns Hopkins University stopped collecting data as to the virus. *See* COVID-19 Dashboard, *supra*, https://bit.ly/2WD4XU9. And, as Chief Judge Bredar of this Court has noted, in consultation with this court's epidemiologist, the virus patterns have changed, with the virus's severity decreasing as "the population has gained some level of immunity from

vaccinations and prior infections." *Id.* Put another way, the coronavirus may be here to stay, but the acute nature of the crisis has certainly abated.

With respect to the BOP, it has reported that, as of April 19, 2023, 185 federal inmates, out of a total population of 145,196, and 28 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 44,375 inmates and 15,269 staff have recovered from the COVID-19 virus.  In addition, 316 inmates and seven staff members have died from the virus.  The BOP has completed 128,646 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to USP McCreary, where the defendant is now imprisoned, the BOP reported that as of April 20, 2023, out of a total of 1,621 inmates, zero inmates and zero staff members currently test positive, two inmates and zero staff members have died of COVID-19, and 251 inmates and 145 staff have recovered at the facility.[6]  In addition, 186 staff members and 1,541 inmates have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/; BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/mck/ (last accessed Apr. 21, 2023).

## IV.  Discussion

### A.

Awosika has moved for compassionate release for medical reasons.[7]  He states that he had cancer in 1998, which is in remission, but he needs to be followed.  ECF 63.  He also claims the

---

[6] At the time defendant filed his Motion, he was housed at Florence United States Penitentiary in Colorado. ECF 63-1

[7] In the Motion, Awosika does not indicate that he petitioned the warden for relief prior to pursuing compassionate release with the Court. Further, the Federal Public Defender noted that it has not received any documentation regarding Awosika's exhaustion of administrative remedies. ECF 69. Nonetheless, the government has failed to raise Awosika's failure to exhaust as a basis for dismissal. And, the "requirement that a defendant satisfy the threshold requirement before filing a motion in the district court is a non-jurisdictional claim-processing rule." *Muhammad*, 16 F.4th at 130.

suffers from paranoid schizophrenia, diagnosed in 2000. *Id.* And, he claims his back has been hurting, but he cannot get medical assistance. *Id.*

The government has submitted Awosika's medical records, ECF 67-1, to support the assertion that defendant's medical treatment is adequate, and therefore his medical conditions do not warrant compassionate release. ECF 67 at 6. Awosika's medical records reflect a history of Leukemia. ECF 69-1 at 12, 14, 15, 18, 21, 33. He received chemotherapy, as well as a bone marrow transplant, in 1996. *Id.* at 15.[8] But, it does not appear that defendant's history of Leukemia currently requires treatment.

The medical records also indicate that since 2008, defendant suffers from "low back pain, lumbago." *Id.* at 34. He is prescribed Motrin for the pain, and his treatment is "current." *Id.*

As to Awosika's schizophrenia, he was prescribed Benztropine and Haloperidol for treatment. *Id.* at 14. However, the medication was discontinued due to defendant's non-compliance, as he refused to take his medication for "3x weeks." *Id.* at 9. However, he denied experiencing "suicide/homicide ideas," "hallucination, mood swing," and "sadness/hopelessness." ECF 69-1 at 3. Awosika cannot refuse treatment for his schizophrenia on the one hand, and on the other ask for compassionate release due to his diagnosis.

---

The Motion has been pending for some time. Therefore, "[i]n the interest of expediency, I will assume without deciding that [Awosika] has met the exhaustion requirement and address the merits of his claim." *United States v. Johnson*, PWG-10-0692, 2022 WL 17467727, at *2 (D. Md. Dec. 6, 2022); *see also United States v. Lunn*, RDB-14-0411, 2022 WL 2315746, at *2 (D. Md. June 28, 2022) ("[T]he Government neither responded to that motion nor argued that Lunn failed to exhaust her administrative remedies. Accordingly, the issue of administrative exhaustion as to Lunn's March 2019 motion is waived, and this Court shall consider the merits of that motion.").

[8] In the Motion, Awosika stated that he was diagnosed with cancer in 1998. However, the PSR, ECF 47 ¶74, and defendant's medical records, ECF 67-1 at 33, indicate that he was diagnosed in 1996. The discrepancy is not material.

Moreover, from Awosika's medical records it appears that he receives routine treatment for his health complaints. *See*, *e.g.,* ECF 67-1 at 5-6 (examined for ear issues); *id.* at 12 (treated for thumb injury); *id.* at 7 (received medical care for COVID-19 symptoms). Accordingly, from the record it appears that Awosika is receiving adequate treatment for his health conditions, and they do not constitute an extraordinary and compelling reason that warrants compassionate release.

As defendant's medical records reflect, Awosika declined an opportunity to receive the COVID-19 vaccine on March 31, 2021 (ECF 67-1 at 38, 42) and on May 21, 2021. *Id.* at 45. To the extent that Awosika's medical conditions are considered in light of the COVID-19 pandemic, his decision to refuse the COVID-19 vaccine weighs against him, and substantially weakens his argument for compassionate release.

The CDC has emphasized that "COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating, including the Delta variant," and that "[w]idespread vaccination is a critical tool to help stop the pandemic." *Key Things to Know about COVID-19 Vaccines*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated July 20, 2022). And, I have previously joined a growing number of district court judges across the country, including in the District of Maryland, in reasoning that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim that his susceptibility to the effects of COVID-19 constitutes grounds for compassionate release.

As Judge Gallagher of this Court has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release . . . . Any decision to the contrary would create a perverse incentive in favor of declining

the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see United States v. Dempsey*, TNM-19-368, 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021) (reasoning similarly); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021); *accord United States v. Simpson*, SAG-16-398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, JAW-16-103-JAW, 2021 WL 2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, JFL-18-264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, JDB-19-292, 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, 525 F. Supp. 3d 253, 255 (D. Mass. 2021).

The vaccine is central to preventing dangerous mutations. *See, e.g.*, *Another Reason To Get Vaccinated? To Stop Variants From Developing*, HENRY FORD HEALTH SYS. (Sept. 27, 2021), https://www.henryford.com/blog/2021/09/get-vaccinated-to-stop-variants. Moreover, "vaccines are the best way to protect yourself and others against COVID-19." Dr. Francis Collins, *Latest on Omicron Variant and COVID-19 Vaccine Protection*, NIH DIRECTOR'S BLOG (Dec. 14, 2021), https://directorsblog.nih.gov/2021/12/14/the-latest-on-the-omicron-variant-and-vaccine-protection/. However, even assuming, *arguendo*, that Awosika has demonstrated extraordinary and compelling circumstances for compassionate release, an analysis of the § 3553(a) factors does not support release.

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). Even when

a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C. § 3553(a).  *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

The government argues that Awosika is a danger to the community, citing the seriousness of his offense.  ECF 67 at 6.  Further, the government contends that Awosika's unwillingness to take medication to treat his schizophrenia, as discussed, would render him a threat to the community.  *Id.*

There is no doubt that defendant's crime was a serious one.  Awosika admitted to the armed carjacking of a woman with a five-month old baby.  And, he proceeded to fire two shots from his revolver at a first responder.  Furthermore, as discussed, Awosika has a significant criminal history. Therefore, a lengthy sentence of incarceration was, and remains, appropriate.

In my view, the sentencing factors set forth in 18 U.S.C. § 3553(a) militate against defendant's release at this time.

## V.  Conclusion

For the reasons set forth above, I shall deny the Motion.  An Order follows, consistent with this Memorandum Opinion.

29

Date: April 27, 2023                                    /s/

                                        Ellen L. Hollander
                                        United States District Judge